J-S65007-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JEFFREY THOMAS | |
| Appellant | No. 378 EDA 2017 |

Appeal from the PCRA Order December 21, 2016
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0004364-2013

BEFORE:  OLSON, J., OTT, J. and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                **FILED NOVEMBER 07, 2017**

Appellant, Jeffrey Thomas, appeals from the order entered on December 21, 2016, denying him relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

On May 26, 2013, Appellant stabbed a man named K.S. (hereinafter "the Victim").  The Commonwealth then charged Appellant with attempted murder, aggravated assault, and other, related crimes.

The case proceeded to a jury trial.  During the trial, Havertown Township Police Officer Harvey Pike testified that he was on duty during the early-morning hours of May 26, 2013.  N.T. Trial, 2/12/14, at 104-105. Officer Pike testified that, at approximately 1:50 a.m. on May 26, 2013, he received a call of a reported stabbing outside the Palombaro Club, in Haverford Township.  *Id.* at 107.  Officer Pike arrived on the scene less than

a minute after the call, located the Victim, and observed that the Victim "had a severe laceration on the . . . right bicep, armpit [,] and chest." *Id.* at 108. As Officer Pike testified, the Victim's arm was "kind of flayed open like a shrimp, how it butterflies" and the Victim's "blood was actually pumping" out of his body from a severed brachial artery. *Id.* at 109 and 110.

At the time, Officer Pike had been an emergency medical technician for over twenty years. *Id.* at 104. Officer Pike testified that he "went to the trunk of the car, got the first aid bag, grabbed a bunch of trauma bandages, four-by-four's, and tried to use direct pressure and bandage the wound as best as I could." *Id.* at 109. However, Officer Pike testified that the aid was ineffective and that he was "getting blood-soaked." *Id.* at 110. Therefore, he and a fellow officer decided to use the Victim's belt as a tourniquet. *Id.* at 112. The effort slowed the bleeding and enabled the Victim to be transported, *via* medical helicopter, to Hahnemann University Hospital in Philadelphia. *Id.* at 5.

Dr. James Eakins testified that he was the on-call trauma surgeon on May 26, 2013 and that he treated the Victim that night. *Id.* at 9. Dr. Eakins testified:

> [The Victim] had two penetrating wounds one was in his neck. The back of his neck as I recall. And the other one was in his right arm. He was brought by the helicopter, Medi-Vac. According to them, when he came in there he had been bleeding a lot. His blood pressure was low. Someone prehospital, I don't know who had put a tourniquet on his arm so it wasn't bleeding when he got to us. He had . . . been put to sleep medically, he had a

breathing tube in which is pretty common practice for patients that are bleeding a lot. We took a look, you know, after he got there, took the tourniquet down to take a look and it was obvious he had an injury to the major artery in his arm. At that point, we involved the vascular surgeon and they took him to the operating room to fix it.

. . .

His [major] injury [was to his brachial artery. The artery] wasn't completely cut in half which is actually – you would think it would be worse for the artery to be cut in half completely. But sometimes – most of the time when that happens the ends kind of retract and clamp down and it doesn't bleed as much. His injury was partial which means it stays open and it bleeds more actually. What the vascular surgeons did was they took out that piece of the artery that was injured and they substituted in – they took a piece of vein from his leg and they put it in there as a substitute.

*Id.* at 10-11.

Dr. Eakins also testified that: if the wound were to have been left untreated, the Victim would have died; "[w]ith an injury of this type where there's a significant amount of blood loss," "it [can] cause memory loss;" and, on the night in question, the Victim's blood alcohol content was either .243 or .293. *Id.* at 13-14 and 19-20.

The Victim testified at trial and told the jury that he could not remember anything that happened on the night in question, that he suffers from lasting, continuous memory loss, and that he experiences a constant numbness and tingling in his right hand. *Id.* at 142-148.

Haverford Township Police Detective Stephen Laughlin also testified at trial. Detective Laughlin testified that, at approximately 1:59 a.m. on May

26, 2013, he was told to report to the Palombaro Club to investigate a reported stabbing. N.T. Trial, 2/11/14, at 169. The detective arrived on location within 30 minutes and, when he arrived, the Victim had already left in the ambulance. *Id.* at 170.

After interviewing eyewitnesses on scene, Detective Laughlin was able to identify Appellant as a suspect in the stabbing. *See id.* at 192-193 and 196. Appellant was arrested days later. *Id.* at 206. On June 6, 2013, Appellant waived his *Miranda* rights and spoke to the detective about the night in question. Detective Laughlin testified:

> I just began speaking to [Appellant] about that night. He – initially he did admit that he was at the Palombaro Club. He provided me with the names of Pierre Long and Anthony Moore who he rode with. At that time he stated to me that there were no problems outside – either inside or outside of the club the night of this incident. . . . He said that . . . the party had ended and he left with Pierre Long and at that point no incident had occurred.
>
> . . .
>
> After I spoke to [Appellant] for about an hour, I did tell him that I had video of the complete incident. At that time I believe it was only at the point where he was admitting that he had a verbal argument with the [V]ictim that possibly turned physical meaning with a fist fight, not involving a knife. He adamantly denied the presence of a knife. I then advised him approximately an hour into the interview that I did have the video of the whole incident. . . . He denied even after [me] letting him know that I had video of the incident he still adamantly denied that he was carrying a knife that night. . . . It was not until about an hour and a half to two hours into the interview that he finally admitted that at one point he did pull a small [razor-type] knife out of his pocket and strike [the Victim]. . . . [Appellant] described it as a small, [two-inch] knife that he used for

- 4 -

work, a [razor-type] knife for stucco work that he typically carried on his person for work purposes.

*Id.* at 213-215.

Appellant provided a final, written statement to the detective. Appellant's statement declares:

> When I left the party two guys were arguing. I tried to calm the situation down. The one guy turns to me and says "f[**]k you we kill," so I tried to punch him in the face. I walked away and he says "I'm going to come to Norristown and get you," so I turned around and ran to him. I tried to punch him again just to try and knock him out. I ended up cutting him by accident. I had my knife out because he scared me. It wasn't my intent to cut him. I didn't know he was cut that bad. I really didn't mean to cut anybody. I had my knife out because I was scared. I'm really sorry that this happened.

*Id.* at 219-220; Commonwealth's Exhibit 26 at 1.

Detective Laughlin testified that he "asked [Appellant] if the [V]ictim at the time had a weapon." Appellant told the detective that the Victim did not have a weapon and "that at no time did [the Victim] deserve to be stabbed." *Id.* at 220. Further, Detective Laughlin testified that Appellant was the initial aggressor on the night in question. N.T. Trial, 2/12/14, at 80-81. Detective Laughlin testified that he based this conclusion on the fact that:

> [Appellant] told me that he threw the first punch. I reviewed the [surveillance] video and already had knowledge that he did from reviewing the video, that he . . . struck the victim. And at no point did [the Victim] actually attempt to strike [Appellant].

*Id.*

Finally, Detective Laughlin testified that, when Appellant was arrested, the criminal complaint specified that Appellant was five-feet, ten-inches in height and that Appellant weighed 200 pounds. *Id.* at 93. The Victim testified that, on the night in question, the Victim was six-feet, two-inches tall and weighed 200 pounds. *Id.* at 157.

The Commonwealth introduced into evidence surveillance video from the Palombaro Club, which captured the incident.[1] *Id.* at 34. The video shows Appellant, the Victim, Anthony Moore, and James Pierre Long standing in the street outside of the Palombaro Club.[2] *See* Commonwealth's Exhibit 35 at 2:09; N.T. Trial, 2/12/14, at 279 and 312. The Victim began an apparent argument with James Pierre Long and Appellant,[3] which

_____

[1] The surveillance video contains no audio.

[2] During trial, Anthony Moore explained the video from his perspective and James Pierre Long testified (without the aid of the video) as to what occurred. *See* N.T. Trial, 2/12/14, at 278-289, 312-317, and 326-327. In this Court's summary of the video, we have used Anthony Moore's narration testimony and James Pierre Long's independent testimony to identify the individuals in the video.

[3] Anthony Moore testified that, at the outset of the argument:

> [The Victim] was [initially] talking to Pierre. And we tried to stop [the Victim]. But he's like talking to all of us. He's like, this is my family, man. And that's what he's saying, this is my family. F[**]k that, this is my family. He threw it down, threw it down. We was trying to say [] come on, man. But he's really like talking to all of us. But then I guess at that point is when he said, f-you. You know what I'm saying, like that.

*(Footnote Continued Next Page)*

- 6 -

escalated when the Victim threw a food plate to the ground, ripped off his shirt, and began to aggressively posture towards Appellant. ***See*** Commonwealth's Exhibit 35 at 2:28 and 2:57; N.T. Trial, 2/12/14, at 283 and 313. After more aggressive posturing and apparent argument by both the Victim and Appellant, Appellant lunged at the Victim and punched him in his head. ***See*** Commonwealth's Exhibit 35 at 3:22; N.T. Trial, 2/12/14, at 284 and 314. James Pierre Long then got in between Appellant and the Victim and separated the two. ***See*** Commonwealth's Exhibit 35 at 3:24; N.T. Trial, 2/12/14, at 284 and 314.

At this point, Anthony Moore grabbed the Victim and James Pierre Long grabbed Appellant – and, while Anthony Moore and the Victim stayed across the street from the Palombaro Club, James Pierre Long and Appellant walked a half-block up the road. ***See*** Commonwealth's Exhibit 35 at 4:08-5:04; N.T. Trial, 2/12/14, at 284-286 and 314.

While James Pierre Long and Appellant walked up the road, the Victim continued his aggressive posturing and yelling towards Appellant. ***See*** Commonwealth's Exhibit 35 at 4:08-5:04; N.T. Trial, 2/12/14, at 284-286 and 314. Nevertheless, throughout this time, the Victim stayed in the area of the Palombaro Club and did not follow Appellant up the street. ***See***

_(Footnote Continued)_ ───────────────

N.T. Trial, 2/12/14, at 283.

Commonwealth's Exhibit 35 at 4:08-5:04; N.T. Trial, 2/12/14, at 284-286 and 314.

However, when James Pierre Long and Appellant were a half-block away – and with the Victim still restrained by Anthony Moore and standing across the street from the Palombaro Club – Appellant suddenly turned around, sprinted at the Victim, and began striking the Victim on his head and body. *See* Commonwealth's Exhibit 35 at 5:04-5:20; N.T. Trial, 2/12/14, at 288 and 315.

When the two separated, Appellant walked up the street and turned the corner, out of range of the surveillance camera; the Victim stood in the same general area of where the fight occurred; and, James Pierre Long walked down the street to meet the Victim. *See* Commonwealth's Exhibit 35 at 5:30. The video then shows James Pierre Long attempting to tie something around the Victim's arm, and the two walk out of range of the security camera. *See* Commonwealth's Exhibit 35 at 5:44; N.T. Trial, 2/12/14, at 316. Approximately two-and-a-half minutes later, the video shows Officer Pike arriving on scene. *See* Commonwealth's Exhibit 35 at 8:16.

The Commonwealth also presented the testimony of eyewitness James Pierre Long. James Pierre Long testified that, on the night of May 25, 2013, he, Appellant, and Anthony Moore drove to the Palombaro Club together, to attend a party at the club. N.T. Trial, 2/12/14, at 306. At the party, James Pierre Long began speaking with the Victim – and the two spoke at various

times throughout the night. James Pierre Long testified that, at the conclusion of the party:

> we got outside it was – me and [the Victim] were still – the conversation from the bathroom was still going on it but it was nothing aggressive. It was nothing aggressive. Like I never at no point felt like that I was going to strike him or I felt threatened by him. . . . And then . . . we started walking towards the car. . . .
>
> [W]hat I recall was when we were walking towards the car[, the Victim] . . . had his food in his hands and he had threw his food. I don't know what was said between [the Victim and Appellant] that triggered that. . . .
>
> And then at that point I think [Anthony Moore] went to go like push on [the Victim] and, you know, like – kind of like get [the Victim]. And then I think I might have grabbed [Appellant]. And, you know, words were being exchanged but I don't really recall what was actually said that night. . . .
>
> They like kind of squared up like they were going to fight like, you know. And they were just kind of moving around each other and they were throwing punches but I don't remember nobody getting hit. And then I guess after me and [Anthony Moore] must have separated it then [Anthony Moore] had [the Victim]. And again me and [Appellant] were walking up to the corner towards my car. . . .
>
> At this point and that's when [Appellant] pulled his knife out. And then when I seen the knife come out that's when I grabbed the tail of his shirt. . . . And then . . . his shirt came out of my hands. And that was it. Then after that, you know, he ran back down there. . . . And he ran back down there and they just looked like they were boxing. It looked like they were fighting, they were fighting again. So I didn't realize that [the Victim] had been cut until [the Victim] lifted his arm and I seen the blood squirting out of his arm. And so – and then that's when I came in and I seen that. And I took my tie off and I told [the Victim] . . . hold still because you're cut. . . . And I tied my tie under

this arm here to try and stop – because all this was – when I got over there like all this from here to here was open. . . . [T]hat whole piece right here was just open. And it was just a lot of blood. So I tried to tie him off here, up under here but it didn't work. So I tried to tie him off again here by like the bend here and it was still squirting blood. . . .

[The Victim] was telling me, he was like, [P], I'm okay. He called me "P" for Pierre. But he said, P, I'm okay, I'm okay. And then at that point he blacked out in my arms and he collapsed. So [the Victim] was a little bigger than when this took place so it was like dead weight. He just like – this big – he just fell in my arms. And I was trying to hold him up but he's heavy so me and him both went down. And then I tried to pick him up and put him up on the grass. . . . I believe that I picked him up and put him on the grass. Because we were on the street. We were like real close to the curb. So I got him up and tried to get him up on the grass the best that I could.

*Id.* at 312-317.

James Pierre Long also testified that he did not remember the Victim ever saying to Appellant "hey, we kill and I know where you live," as Appellant declared in his written statement to the police. *Id.* at 326-327.

After the Commonwealth rested, Appellant presented a number of character witnesses who testified as to Appellant's reputation for peacefulness and non-violence in the community. *See* N.T. Trial, 2/19/14, at 10-40. Appellant did not present any other witnesses. *Id.*

The trial court charged the jury on February 19, 2014 and, as is relevant to the current appeal, the trial court charged the jury on self-defense. *Id.* at 136-140.

On February 19, 2014, the jury found Appellant guilty of one count each of attempted murder, possession of an instrument of crime, simple

assault, and recklessly endangering another person and two counts of aggravated assault.[4]  On March 28, 2014, the trial court sentenced Appellant to serve an aggregate term of 12 to 24 years in prison, followed by 12 years of probation, for his convictions.  This Court affirmed Appellant's judgment of sentence on March 23, 2015; Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.  *See **Commonwealth v. Thomas***, 120 A.3d 1060 (Pa. Super. 2015) (unpublished memorandum) at 1-9.

Appellant filed a timely PCRA petition on April 7, 2016.  As is relevant to the case at bar, Appellant claimed in the petition that he was entitled to a new trial because:  1) his trial counsel was ineffective for failing to thoroughly investigate his case and discover an eyewitness to the stabbing named Brandon Gibbs, and his counsel was also ineffective for failing to call Brandon Gibbs as a witness at trial, and 2) Brandon Gibbs' statement and potential testimony constitutes after-discovered evidence, which would likely compel a different verdict.  Appellant's PCRA Petition, 4/7/16, at 1-10.  Appellant also attached Brandon Gibbs' affidavit to his PCRA petition.  In the affidavit, Brandon Gibbs averred:

> 1. After midnight on May 26, 2013, I was outside Palombaro Club with Turquois Gibbs.

---

[4] 18 Pa.C.S.A. §§ 901(a), 907(a), 2701(a)(1), 2705, 2702(a)(1), and 2702(a)(4), respectively.

2. I observed a tall, light skinned man with curly hair, the alleged victim in this case, start a fight with [Appellant], and continue to try to fight with him even as [Appellant] walked away.

3. I observed that this man was very intoxicated and was not going to leave [Appellant] alone, despite being much bigger than [Appellant].

4. I believe that [Appellant] did what he had to do, based on the fight that the alleged victim was trying to start, and that [Appellant] acted in self-defense.

. . .

6. I and Turquoise Gibbs were both living in the same apartment we live in now, and we were both willing to testify for [Appellant]; no one ever contacted me to testify at trial.

7. I attempted to find out who [Appellant's] attorney was by reading the newspaper and asking around in Norristown.

8. I was told by someone who did testify, after the fact, that the Gold Pacifica [automobile], which is registered in my name, was clearly visible on the video of the incident and that that witness believed it was our car.

9. I would be willing to testify to this information at a PCRA hearing. . . .

Affidavit of Brandon Gibbs, dated 3/15/16, at 1.

On September 15, 2016, the PCRA court held a hearing on Appellant's petition and, during the hearing, Appellant called one witness: Brandon Gibbs.

Mr. Gibbs testified that, at the time of the incident, he was familiar with Appellant and James Pierre Long, but that he did not know the Victim or

- 12 -

Anthony Moore. N.T. PCRA Hearing, 9/15/16, at 14, 16, and 39. As Mr. Gibbs testified, at the time of the altercation, he was sitting in a vehicle that was parked directly outside of the Palombaro Club. *Id.* at 13 and 25. Mr. Gibbs testified that he observed the following:

> I had just finished helping my dad and my brother pack up the speakers [from inside the Palombaro Club]. I went back in, got my wife and on the way out this tall light skinned guy[, who was the Victim,] he was out there acting erratic[ly]. . . . He was using profanity [and] . . . was just very aggressive and argumentative. . . . To me he seemed to be inebriated. . . . He was being confrontational towards . . . [p]retty much everybody.
>
> [H]e was being more directly aggressive towards Pierre [Long]. . . . I guess [Appellant] tried to tell him to calm down. [The Victim] then turned his aggression towards [Appellant]. . . . [The Victim t]ook his shirt off and started wanting to fight [Appellant]. . . .
>
> I observed [Appellant] try to basically get [Pierre] Long and his self to walk away. I observed [the Victim] take a swing and punch [Appellant]. . . . I think [Appellant] swung back and then [Pierre] Long put his self in-between to try to separate them. The [Victim] was still trying to continue to fight. [Appellant] started to walk down the street. . . . The [Victim] kept walking down after him and threatening him, trying to still fight. Like he was – the [Victim] had Pierre and there was another guy, I don't know his name, but they was trying to calm him down, but he was a pretty big guy. So, there wasn't so much they could do. . . .
>
> Well, when [Appellant] was trying to walk away and [the Victim] was walking after him, [Appellant] I thought he punched him. I guess he stabbed him because I seen blood after that and the [Victim] was still, you know, acting – that made him even more erratic and as far as his threats and the things that he was saying.

*Id.* at 17-29.

- 13 -

Mr. Gibbs testified that, immediately prior to the stabbing, Appellant was walking away from the confrontation and the Victim "was right behind him." *Id.* at 60. According to Mr. Gibbs, Appellant simply "turned around and stabbed [the Victim]." *Id.*

Mr. Gibbs testified that, after the stabbing, he left the scene in his vehicle. As Mr. Gibbs testified:

> the next day after the incident I . . . googled like some key words, stabbing in Ardmore, a couple other things to try to see what happened because I don't know what happened to the [Victim] or [Appellant]. I just wanted to see if there was anything written about it and I . . . couldn't find anything. I looked for maybe a couple days and . . . I couldn't find anything. So, I figured nothing ever happened.

*Id.* at 30.

Mr. Gibbs testified that he first learned of Appellant's arrest after Appellant had been convicted and sentenced; Mr. Gibbs testified that he contacted Appellant's attorney as soon as he was able to obtain a contact number. *Id.* at 31-32.

On December 21, 2016, the PCRA court entered an order denying Appellant relief on his petition. As the PCRA court explained, Appellant's after-discovered evidence claim failed because:

> [Appellant] fail[ed] to show that [Mr. Gibbs'] testimony is not cumulative. Mr. Gibbs testified to similar if not the same facts already introduced at trial. The only difference is the perspective from where the incident was witnessed. . . . From Mr. [Gibbs'] testimony, it is clear that his account is relatively the same as what was visible in the

- 14 -

[surveillance] video as well as from [the testimony of] other witnesses. . . .

[Appellant] here fails also to show that such evidence would likely compel a different verdict. As stated above[,] the testimony of Mr. Gibbs is cumulative as well as the testimony offered does not rise to the level of exculpatory evidence. The level of doubt created by Mr. [Gibbs'] testimony does not go beyond that doubt created, if any, that was introduced with the video evidence or the other testimony offered at trial. . . .

PCRA Court Order, 12/21/16, at 6 (internal citations omitted).

Moreover, the PCRA court concluded that Appellant's ineffective assistance of counsel claim failed because: "Mr. Gibbs was a witness who was difficult, if not impossible, to locate" and because Mr. Gibbs' testimony was cumulative of other evidence that was introduced at trial. *Id.* at 4-5.

Appellant filed a timely notice of appeal. Appellant raises three claims to this Court:

> 1. Did the PCRA court err in finding that [Appellant] did not have newly discovered evidence that would have been likely to change the outcome of trial through the testimony of Brandon Gibbs?
>
> 2. Did the PCRA court err in finding that the PCRA [petition] should be denied based on a finding of no ineffective assistance of counsel, which is not required in a claim for newly discovered evidence?
>
> 3. Did the PCRA court err in finding that [Appellant's trial counsel] was not ineffective for his failure to present evidence of the self-defense witness, as presented at the PCRA evidentiary hearing?

Appellant's Brief at 8.[5]

As we have stated:

> [t]his Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by evidence of record and is free of legal error. In evaluating a PCRA court's decision, our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. We may affirm a PCRA court's decision on any grounds if it is supported by the record.

***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa. Super. 2010) (internal citations omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi).

To obtain relief based on after-discovered evidence, an appellant must show that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not

---

[5] For ease of discussion, we have reordered Appellant's claims on appeal.

- 16 -

merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Commonwealth v. Foreman***, 55 A.3d 532, 537 (Pa. Super. 2012), *citing*

***Commonwealth v. Pagan***, 950 A.2d 270, 292 (Pa. 2008). To determine

whether the evidence is "of such nature and character" to compel a different

verdict in a new trial, a court should consider "the integrity of the alleged

after-discovered evidence, the motive of those offering the evidence, and

the overall strength of the evidence supporting the conviction."

***Commonwealth v. Padillas***, 997 A.2d 356, 365 (Pa. Super. 2010), *appeal*

*denied*, 14 A.3d 826 (Pa. 2010).

In the case at bar, we agree with the PCRA court that Mr. Gibbs'

testimony would have been cumulative of the evidence presented at trial

and that Mr. Gibbs' testimony was not "of such nature and character" to

compel a different verdict in a new trial. To be sure, during Appellant's trial,

the Commonwealth introduced clear video evidence of the entire incident.

When combined with the Commonwealth's other evidence at trial, Mr. Gibbs'

proposed testimony largely restated the contents of the video and the

Commonwealth's evidence, from Mr. Gibbs' perspective and memory. In

particular, the jury was well-aware that: prior to the fight, the Victim "was

out there acting erratic[ly]," "using profanity," and "was just very aggressive

and argumentative;" the Victim was inebriated; the Victim's aggression was

initially directed towards James Pierre Long, but was quickly turned towards

Appellant; "[the Victim t]ook his shirt off and started wanting to fight

[Appellant];" there was a fight between the Victim and Appellant; the Victim "was a pretty big guy" and was larger than Appellant; and, prior to the stabbing, Appellant was walking away from the confrontation.

We acknowledge that, in some instances, Mr. Gibbs' proposed testimony differs from the clear video evidence. For example, Mr. Gibbs testified during the PCRA hearing that: the Victim punched Appellant first and, immediately prior to the stabbing, when Appellant was walking away from the Victim, the Victim walked after Appellant and got so close that Appellant merely "turned around and stabbed" the Victim. *See* PCRA Hearing, 9/15/16, at 27 and 60. However, this proposed testimony is not "of such nature and character" as to compel a different verdict in a new trial because the testimony is clearly refuted by the video evidence, which reveals that: Appellant was the first to strike the Victim and, immediately prior to the stabbing, Appellant was approximately one-half of a block away from the Victim – with the Victim being restrained by Anthony Moore – when Appellant suddenly turned around, sprinted the half-block towards the Victim, and began striking the Victim about his head and body. *See* Commonwealth's Exhibit 35 at 5:04-5:20; N.T. Trial, 2/12/14, at 288 and 315; *see also Padillas*, 997 A.2d at 365 ("before granting a new trial, a court must assess whether the alleged after-discovered evidence is of such nature and character that it would likely compel a different verdict if a new trial is granted. In making that determination, a court should consider **the integrity of the alleged after-discovered evidence**, the motive of those

offering the evidence, **and the overall strength of the evidence supporting the conviction**") (internal citations omitted) (emphasis added).

Thus, the PCRA court did not abuse its discretion in denying Appellant relief on his after-discovered evidence claim.

Appellant's second and third claims on appeal may be quickly disposed of, as: the PCRA court did not engraft ineffective assistance of counsel requirements upon Appellant's after-discovered evidence claim (therefore, the PCRA court did not "err in finding that the PCRA [petition] should be denied based on a finding of no ineffective assistance of counsel, which is not required in a claim for newly discovered evidence")[6] and, during the PCRA hearing, Appellant did not present the testimony of trial counsel (therefore, Appellant did not satisfy his burden of production on his ineffective assistance of counsel claim and the PCRA court did not "err in finding that [Appellant's trial counsel] was not ineffective for his failure to present evidence of the self-defense witness").

Order affirmed. Jurisdiction relinquished.

---

[6] Certainly, within the PCRA court's December 21, 2016 order, the PCRA court explicitly declared that Appellant's after-discovered evidence claim failed because Mr. Gibbs' proposed testimony was both cumulative and not "of such nature and character" as to compel a different verdict in a new trial. *See* PCRA Court Order, 12/21/16, at 6.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/7/2017</u>